# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHELLY SALAK NEWELL,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **NO. 12-6094** |
| | : | |
| **HERITAGE SENIOR LIVING, LLC,** | : | |
| **and WESTRUM HANOVER, LP,** | : | |
| **trading as TRADITIONS OF** | : | |
| **HANOVER,** | : | |
| **Defendants** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                                 **February 3, 2016**

Shelly Newell filed an action against her former employer alleging retaliation in violation of the Fair Housing Act (the "Act").  Specifically, she claims that the defendants retaliated against her because she encouraged prospective tenants to exercise their rights and because she opposed the defendants' alleged discrimination against prospective tenants on the basis of disability.  <u>See</u> 42 U.S.C. § 3617.[1]  The parties filed cross motions for summary judgment.  For the following reasons, I will grant the defendants' motion for summary judgment, deny the plaintiff's motion, and enter judgment on behalf of the defendants.

## I.  BACKGROUND

Defendant Traditions of Hanover, located in Bethlehem, Pennsylvania, is an

---

[1] Section 3617 provides:  It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the Fair Housing Act].

independent living facility for seniors.  As an independent living facility, Traditions

leases apartments and provides seniors over the age of fifty-five with food, housekeeping,

and transportation services.  Defendant Heritage Senior Living, LLC, "manages and/or

owns" Traditions and is an organization that provides guidance and management services

to senior living communities.  See Compl. ¶ 19.

On October 18, 2010, Newell began working at Traditions as a marketing

manager.  Jennifer Murphy, Director of Marketing at Traditions, was her direct

supervisor.  In this position, Newell marketed the facility to prospective residents with

the goal of expanding Traditions' wait list.  Central to her role as marketing manager was

"assisting [Murphy] in representing [Traditions] in a positive light, maintaining favorable

relationships with hospitals, local physicians, and other marketing and referral sources."

See Document #71-12, Exhibit I.

The parties dispute Newell's effectiveness as a member of the marketing team in

the initial months of her employment.  The parties, however, agree that in late January

2011, Newell received a ninety-day review where she received praise for her work.  The

evaluation also noted that Newell "needs to communicate clearly with all levels of staff

so each are informed about tours and upcoming events."  See Document #71-13, Exhibit

J.  I note that the evaluation did not mention Newell making complaints concerning the

defendants' compliance with the Act.  Id.

In April 2011, Murphy denied Newell's initial request for permission to join the

Board of the Lehigh Valley Aging in Place Organization.  Both parties agree that around

2

this time, the work relationship between Newell and Murphy became strained.  Newell
stated that Murphy did not trust her and openly complained about Murphy's management
style.  <u>See</u> Document #71-9, Exhibit F.  On April 19, 2011, Diane Nowakowski,
Executive Director of Traditions, sent an email that expressed her frustration with Newell
because of her lack of respect for Murphy.  <u>See</u> Document #71-15, Exhibit L.

Newell alleges that when she began work at Traditions, the residence had criteria
in place designed to assess prospective residents to ensure that they were a "match" for
Traditions.  Newell contends that the staff was directed to evaluate the "functional
capabilities" of prospective residents and take stock of any medical issues.  <u>See</u>
Document #73-12, Exhibit 8.  The defendants deny that any criteria was in place and
state that any assessment Traditions staff made pursuant to the Heritage Senior Living
Case Management Document was to ensure that Traditions could provide the services
necessary to meet a potential resident's needs.  <u>Id.</u>; <u>see also</u> Document #77-10, Exhibit I.

On February 5, 2012, Nowakowski sent an email to Murphy and Margaret
Dominici, Director of Residence Life at Traditions, with an attached document entitled
"Characteristics of Independent Prospects" ("CIP").  Although this document was not
formally adopted by Traditions, Newell stated that she and other staff members used the
criteria when evaluating prospective residents.  On February 8, 2012, Nowakowski
forwarded the document to Newell asking for her comments.  Newell responded that she
felt that the no assistance policy reflected in the CIP was "subjective" and "restrictive,"
and would send a conflicting image to prospective residents who would notice that

current residents were wheelchair-bound and receiving support at Traditions.  <u>See</u> Document #73-15, Exhibit 11.  Newell did not reference the Act in her comments to the CIP document.  <u>Id.</u>

On February 28, 2012, Murphy emailed Newell a document entitled "Who are We at Traditions of Hanover?"  That document highlighted qualities that Traditions found desirable in new residents and included "current requirements for residency," one of which required residents to "[be] able to get to and from the [Dining Room] on their own accord."  <u>See</u> Document #73-17, Exhibit 13.  Again, Newell did not directly reference the Act, but raised concerns about the contents of that document responding, "there [are] different criteria for current residents vs. new residents . . ."  <u>Id.</u>

On February 29, 2012, the day after Newell received the draft of WWT, she met with Murphy to discuss her performance at Traditions.  Murphy had written a list she called "Expectations Moving Forward" which contained talking points for the meeting.  In "Expectations," Murphy expressed her opinion on Newell's performance and noted several areas of concern:  "Your attitude, your ability to take direction from your director without push back on projects like creating an outreach plan and inner circle and helping with the territory map.  Finally, I am concerned about your ability to show respect to your director.  Showing little or no respect has been noticed at all levels of the team here at Traditions of Hanover."  <u>See</u> Document #71-28, Exhibit Y.  Murphy also included:  "Of late, you have shown behaviors that undermine both Diane and [me].  These behaviors actually are sabotaging me and dividing the team.  This will need to stop or an *action*

*plan* will need to be [put] into place.  The ball is really in your court to make the

necessary changes."  Id.  In an email from Murphy to Nowakowski, Murphy indicated

that Newell seemed to take ownership of some of the critiques Murphy expressed and

Newell stated that she felt the problems discussed in the meeting stemmed from a lack of

trust between herself and Murphy.  See Document #71-29, Exhibit Z.  Related emails

between management show that David Lovitz, President of Heritage, thought Newell was

obviously deflecting feedback rather than embracing it, and viewed Newell's marketing

team as "dysfunctional."  See Document #71-30, Exhibit AA.

On March 23, 2012, Murphy emailed Lovitz informing him that she intended to

meet with Newell again.  In that email, Murphy explained that Newell's supervisors

recognized that she was not happy in her position, and that she would have until

Thursday, March 29, 2012 to decide if she wanted to continue working there.  The email

also stated that Traditions would help make the transition smooth if she chose to leave.

Lastly, the email noted that if Newell decided to stay, "then changes will need to be made

immediately in order to make the working environment fun again both in the Marketing

office and the entire TOH [Traditions] team."  See Document #71-31, Exhibit BB.  A

proposed action plan indicated:  "Team [Newell] ends. You need to yield to your director

and be a team player instead of going in the opposite direction."  Id.

On March 25, 2012, Nowakowski circulated another document to Dominici and

Murphy entitled "Guidelines for Evaluating Prospective Residents," which stated that

"[w]hen new residents join our community they should be capable of living on their own

without any significant healthcare intervention" and prospective residents "should be independently mobile and preferably not confined to a wheelchair." <u>See</u> Document #73-20, Exhibit 16. The parties dispute whether Newell actually received that document. The parties agree, however, that Newell received a revised copy of the Guidelines on April 26, 2012. Newell testified that she had a conversation with Murphy where she indicated her concerns with the revised Guidelines. Her main concern centered around Traditions' insistence that prospective residents should be able to manage incontinence and other issues. Newell also stated to Nowakowski that she felt "they were still in violation" and suggested that Nowakowski speak with someone at the Fair Housing Council of Suburban Philadelphia to check the legality of Traditions' actions. <u>See</u> Document #73-6, Exhibit 2. Nowakowski was receptive to Newell's suggestion and asked for the FHCSP's contact information. <u>Id.</u>

Newell further alleges that, beginning in January 2012, Traditions discouraged three couples from moving into the residence and caused them to decide to live elsewhere because of their respective handicaps. The husband of Couple A was wheelchair-bound, and Newell felt that Murphy was screening them out because of that impairment. Newell testified that she complained to Murphy that "we couldn't reject someone for residency at Traditions based on the fact that they were in a wheelchair." <u>See</u> Document #73-6, Exhibit 2 at 41. At her deposition, however, Murphy could not corroborate that statement. <u>See</u> Document #71-7, Exhibit D at 148:17-149:7. Traditions' activity notes for Couple A show that Murphy recommended that Couple A use ElderCare Associates, a

6

third party agency, to perform an evaluation of them.  See Document #71-17, Exhibit N.
ElderCare Associates found that Couple A "could come to Independent Living for the
short term but for the long term would benefit from Assisted Living."  Id.  Ultimately,
ElderCare Associates encouraged Couple A to seek residency at a nearby facility that
offered both independent and assisted living facilities.

Newell also contends that Traditions sought to discourage Couple B from moving
into Traditions because the wife had a cognitive impairment.  On February 24, 2012,
Newell met with Dominici, Nowakowski, and Lovitz, to discuss Couple B's application.
See Document #77-11, Exhibit J.  At that meeting, Dominici expressed doubt about
Couple B's ability to be safe at Traditions because of the wife's dementia and concerns
expressed by their son regarding their ability to live independently at Traditions.  Id.  The
activity notes for Couple B show that their son had made Traditions aware that his
mother suffered from a memory problem and would not be safe alone at Traditions
around October 2011.  See Document #77-16, Exhibit O.  Nevertheless, Newell testified
at her deposition that she advocated for Couple B and stated that at a meeting she raised
Act concerns regarding Traditions' treatment of Couple B.  See Document #73-6, Exhibit
2 at 390-391, 415.  Nowakowski admitted at her deposition that Newell "may have"
raised Act concerns at the meeting.  See Document #77-3, Exhibit B at 201.  Ultimately,
Couple B moved into Traditions based on Newell's favorable assessment of the couple's
ability to live there.  Soon after arriving at Traditions, they moved out on their own
accord.

Finally, Newell alleges that Traditions discouraged Couple C from moving into the residence because during the tour both the husband and wife had shown signs of dementia. The wife's condition seemed worse than that of her husband. Newell was Couple C's primary contact at Traditions and encouraged their residency there. In April 2012, the couple toured the facility. Newell contends that after the tour, Maggie Dominici asked personal questions in a "patronizing tone" concerning the wife's ability to care for herself. See Document #73-6, Exhibit 2 at 430. Newell's activity notes for that day, however, show that she and Dominici sat down and answered questions for the couple. See Document #77-19, Exhibit R. Following Newell's termination, Traditions offered Couple C residency at the facility.

On March 26, 2012, Murphy asked Newell to input "loss leads" -- reasons why a prospective resident was not pursued for residency -- into a database at Traditions. Newell informed Murphy that she would not do so because she believed registering "loss leads" constituted a violation of the Act. Murphy expected that pushback from Newell and dismissed the discussion as a typical one. See Document #71-7, Exhibit D at 193. An April 3, 2012 email from Murphy to Lovitz captures Murphy's reaction to Newell's refusal. Murphy stated:

> I also asked Shelly to document in REPS (per Diane) when we decide not to pursue a deposit from someone due to the IL criteria that was established. Shelly explained that is against the law to discriminate against someone due to the criteria (fair housing act) and she will not document this in REPS. She will tell me so I can document it but she will not. I agreed to have her tell me so I can write it down and actually, I think I can keep better track of it this

8

way for now.

<u>See</u> Document #77-26, Exhibit Y.

On March 27, 2012, Murphy and Nowakowski met with Newell to discuss her job performance at Traditions.  Nowakowski summarized the meeting in an email to Lovitz where she stated that Newell wanted to keep her job.  Nowakowski also noted that Newell and Murphy had a trust issue and that Newell would complete a thirty-day project under Murphy's supervision.  Murphy stated that she was motivated to have that meeting with Newell because:

> There – I mean, she exhibited pretty much from that three month mark on signs that she did not like her computer screen, she did not like her printer, she did not sign up for more than 40 hours a week at work at the community.  She made comments like, we don't pay enough for what – the work that was required for the position, and she – I -- I should have been documenting all of these things from the very beginning with – with her, and I did not.  So, when I started to document it was – you know, it became apparent that there – that this – she was just being insubordinate and having just behavior issues.   You can't really manage somebody who just is tough to deal with on a daily basis.

<u>See</u> Document #71-7, Exhibit D at 195-196.

On March 27, 2012, the same day as her meeting with Murphy and Nowakowski, Newell anonymously contacted the FHCSP, without mentioning that she worked for Traditions.  The purpose of the call was to "make sure I [Newell] had a clear understanding of the law" and to "make sure that the Fair Housing Law didn't pertain differently to seniors or senior communities."  <u>See</u> Document #77-11, Exhibit J at 374.  Margaret Bolin, the FHCSP employee with whom Newell spoke that day, recorded notes

of the exchange.  Bolin's notes indicate that Newell felt Traditions' policies were discriminatory.  See Document #77-24, Exhibit W.

On May 8, 2012, Newell called the FHCSP again.  This time she raised concerns to Bolin about the defendants' Guidelines criteria.  Newell further stated that Nowakowski had been receptive to her concerns and took the FHSCP's contact information.  See Document #77-11, Exhibit J at 386.  According to Bolin's notes of the call, Newell told her that Nowakowski "was struggling with fair housing laws and that [Newell] had provided FHCSP's contact information to her in an effort to bring the discriminatory policy to management's full attention."  See Document #77-28, Exhibit AA.  Bolin's notes further show that Newell provided Bolin with a significant amount of information about the defendants.  Newell told Bolin that Traditions had "been open for 7 years and initially there were no restrictions based on disability but as the community began to fill up they became more restrictive on who they were allowing into the community."  Id.  Later that day, at Bolin's request, Newell forwarded the most recent draft of the Guidelines to the FHCSP.  I note that Bolin's notes for that telephone conference do not contain any reference to Newell reporting that she was being or had been retaliated against because of her references to the Act or because she supplied Bolin's contact information to Nowakowski.  Id.

On April 9, 2012, Murphy emailed Lovitz and Nowakowski for guidance regarding an email she had received from Diane Hodgson, a local realtor, who often worked with Traditions and its prospective residents.  Hodgson reported to Murphy that Newell's husband, Thomas Newell, had given a quote to Couple B, the prospective

residents discussed above, to perform electrical repairs to their house, and had

encouraged Couple B to have the work performed.  Hodgson informed Murphy that she

had advised them against having the work performed and to sell the property "as is."  See

Document #77-36, Exhibit II at 2.  Murphy stated that the version of events conveyed by

Hodgson gave rise to a conflict of interest because Newell, directly or indirectly, would

be financially benefiting from a prospective resident on Traditions' wait-list.  Id. at 2-3.

Murphy confronted Newell about what Hodgson had told her.  On April 11, 2012,

after she had spoken with Newell, Murphy emailed Lovitz and Nowakowski, conveying

Newell's side of the story:

> Shelly's side of the story is that [Couple B] asked Shelly
> for a recommendation for electrical work prior to them
> getting on the waiting list.  She mentioned her husband
> and he gave them a quote.  (Shelly says she recommends
> people all the time as I do as well like Diana to sell their
> home.  She sees no issue with recommending her husband
> but will now recommend his partner Joe.)  Shelly said that
> her husband Tom recommended that [Couple B] do not go
> through with the work since they are selling their home as
> is… I asked if she knew [Couple B] prior to her
> employment and she said no.

See Document #77-36, Exhibit II.  On April 12, 2012, Lovitz met with Newell to discuss

the matter.  Lovitz testified that Newell told him that "if it was inappropriate for her

husband to propose work, then she would have his partner do the work" and that "she

made no attempt to – to refute that her husband tried to do the work, and she admitted

that – that – that it was a conflict of interest."  See Document #77-8, Exhibit G at 172.

Lovitz also described Newell as "defiant" when confronted about the conflict.  Id. at 177.

Ultimately, Thomas Newell did not complete any work for Couple B.  The Newells denied Hodgson's version of the story.

After initially denying Newell's request to apply for an LVAIP Board member position, Murphy gave Newell permission to apply for the 2012 LVAIP Board.  On May 8, 2012, Murphy emailed Nowakowski, informing her that she, along with the entire LVAIP, had just been emailed a newsletter about the Board Nominees, in which Newell made the following statement in her Board application –

> "[Question:]  Why do you want to be a Board member?
>
> [Newell:]     It will be challenging in many ways.  Most challenging part will be trying to convince my employer that this will be time well spent and more so, great exposure for them."

See Document #77-38, Exhibit KK.  Murphy told Nowakowski that she felt that Newell's statement was "disrespectful" and "negative PR."  Murphy wondered that if Newell was comfortable putting such a statement in writing, then she must be very comfortable talking about Traditions outside of its walls.  Id.

Lovitz testified that Newell "violated her obligation to present us in a positive light in the community by implying that we did not value the organization."  See Document 77-8, Exhibit G at 185-186.  He added that disclosing that statement to the entire Lehigh Valley public was showing Traditions in an extremely poor light.  Id. at 187.  Lovitz stated that he felt Newell's actions were in willful violation of the defendants' policy and he terminated her employment because of the culmination of those two events and her history of making things difficult in the marketing department.

Id. at 185.  On May 15, 2012, Newell was terminated from her position as marketing manager at Traditions.

## II.  STANDARD OF REVIEW

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials.  FED. R. CIV. P. 56(c)(1)(A).  That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. at 322. Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Id. at 252.  If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

At his deposition, Lovitz testified that there were three primary reasons why he terminated Newell's employment:  (1) Newell violated the defendants' conflict of interest policy by referring her husband to Couple B to perform work; (2) she failed to present the defendants in a positive light via the statement in her LVAIP Board application; and (3) she was chronically insubordinate and continually showed a lack of respect to her supervisors.  See Document #71-11, Exhibit H at 208-209, 214-217.

Newell alleges that the defendants violated § 3617 of the Act for terminating her employment in retaliation for having aided and encouraged prospective tenants of Traditions in the enjoyment of their rights protected under § 3604(f).  The Fair Housing

Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601-3631, "was designed to provide nationwide fair housing to minorities who had previously been victims of invidious racial discrimination."  Mitchell v. Cellone, 389 F.3d 86, 87 (3d Cir. 2004) (citing Jones v. Alfred H. Mayer Co., 392 U.S. 409, 439-440 (1968)).  The Fair Housing Act protects individuals from discrimination based on race, color, national origin, sex, religion, or familial status in relation to the sale or rental of housing.  See 42 U.S.C. §§ 3604(a).  In 1988, Congress amended the Act to expand protection to individuals with a handicap or disability.  See 42 U.S.C. §§ 3604(f).  The Act also makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of her having exercised or enjoyed, or on account of her having aided or encouraged any other person in the exercise and enjoyment of, any right granted or protected by the Fair Housing Act.  See 42 U.S.C. § 3617; see also Broome v. Biondi, 17 F. Supp.2d 211, 219 (S.D.N.Y. 1997) (plaintiff recovered under Section 3617 where she demonstrated that she encouraged a prospective sublessee to follow through with an application, helped the sublessee move into a building, and investigated the defendant's discriminatory practices).

Retaliation claims under the Fair Housing Act are analyzed under the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Madison v. Phila. Housing Auth., 2010 U.S. Dist. LEXIS 62217 (E.D. Pa. June 23, 2010) (citing Walker v. City of Lakewood, 272 F.3d 1114, 1128 (9th Cir. 2001); Campbell v. Robb, 162 F.App'x 460 (6th Cir. 2006)).  Under

the <u>McDonnell Douglas</u> burden-shifting framework, as applied to FHA retaliation claims, a plaintiff must first establish a *prima facie* case of retaliation under Section 3617 by demonstrating: (1) that she engaged in a protected activity; (2) that the defendants subjected her to an adverse action; and (3) that a causal link existed between the protected activity and the adverse action. <u>Walker</u>, 272 F.3d at 1128. If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate a "legitimate nondiscriminatory reason for its decision." <u>Id.</u> If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was "merely a pretext for a discriminatory motive." <u>Id.</u>

Here, Newell has failed to demonstrate a *prima facie* case of retaliation under Section 3617 of the Act. Although Newell demonstrated that she engaged in protected activity and that her termination was an "adverse action," she has failed to show that a causal link existed between the protected activity and her termination. In the alternative, even assuming that Newell had established a *prima facie* case, this action would still fail because the defendants articulated legitimate non-discriminatory reasons for their decision to terminate Newell's employment, and Newell has failed to demonstrate that those reasons were pretext.

### A.  First and Second Prongs of the *Prima Facie* Case

#### 1.  Engaging in Protected Activity

"Protected activity" under § 3617 includes protests against discriminatory policies. <u>See</u> <u>Grasty v. World Flavors, Inc.</u>, 2011 U.S. Dist. LEXIS 89277 (E.D. Pa. Aug. 11,

2011); <u>Barber v. CSX Distrib. Servs.</u>, 68 F.3d 694, 702 (3d Cir. 1995).  Protests or

complaints need not specify "discrimination" or other "magic words" to qualify as

protected activity.  <u>Sitar v. Ind. Dep't of Transp.</u>, 344 F.3d 720, 727 (7th Cir. 2003).

They must merely indicate that discrimination on the basis of disability is an issue.  <u>Id.</u>

To sustain a claim of retaliation under § 3617, Newell must establish that she had a "good

faith, reasonable belief" that the defendants' conduct violated the Act.  <u>Neudecker v.</u>

<u>Boisclair Corp.</u>, 351 F.3d 361, 364 (8th Cir. 2003); <u>Broome v. Biondi</u>, 17 F. Supp.2d at

219.  Therefore, Newell does not need to prove that the conduct she opposed actually

violated the Act.  <u>Broome</u>, 17 F. Supp.2d at 219.  However, traditionally, to state a claim

for retaliation under the Act for termination of employment, the plaintiff-employee must

demonstrate a refusal to cooperate with an employer's activities that the employee

believed was in violation of the Act.  <u>See</u> <u>Gonzalez v. Lee Cnty. Hous. Auth.</u>, 161 F.3d

1290 (11th Cir. 1998).

 The evidence shows that Newell possessed the requisite good faith, reasonable

belief because Traditions' written guidelines raised legitimate issues with respect to

compliance with the Act.  Newell protested to her supervisors that the defendants'

policies and actions with respect to certain prospective residents amounted to

discrimination on the basis of disability in violation of the Act.  It is undisputed that

Newell provided feedback about the CIP and WWT, stressing that they seemed to be in

violation of fair housing laws.  When Murphy asked Newell to input "loss leads" into a

database at Traditions, Newell informed Murphy that she would not do so because she

believed registering "loss leads" constituted a violation of the Act.  She also voiced her concerns twice to the FHCSP.  Newell then shared the knowledge she gained about the Act with Nowakowski and encouraged her to call the FHCSP on Traditions' behalf. Newell directly stated on a number of occasions that Traditions was "in violation" of the Act and told her supervisors that their policies were in violation of the Act.  An employee's resistance to her employer's discriminatory housing policy is a protected activity under Section 3617.  See Gonzalez, 161 F.3d at 1292, 1307.  Accordingly, I find that by participating in protected activity, Newell satisfied the first prong of the *prima facie* case for retaliation under the Act.

    2.  Adverse Action

    Likewise, Newell has satisfied the second prong of the *prima facie* case for retaliation because the termination of her employment is considered an adverse action under the Act.  Daniels v. Sch. Dist. of Phila., 2013 U.S. Dist. LEXIS 159937 (E.D. Pa. Nov. 7, 2013); Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 288 (3d Cir. 2001).

**B.  Third Prong of the *Prima Facie* Case**

    Because Newell has not provided sufficient evidence showing a causal link between her termination and her protected activity, she has failed to establish the third prong of the *prima facie* case for retaliation under the Act.

    To determine causation, a court should consider "a broad array of evidence in determining whether a sufficient causal link exists to survive a motion for summary

judgment." <u>LeBoon v. Lancaster Jewish Community Ctr. Ass'n.</u>, 503 F.3d 217, 232 (3d

Cir. 2007). "Temporal proximity alone will generally be insufficient to establish the

necessary causal connection when the temporal relationship is not unusually suggestive."

<u>Kelly v. Lehigh Northampton Airport Auth.</u>, 2004 U.S. Dist. LEXIS 7096 (E.D. Pa.

2004). "Where the temporal proximity is not unusually suggestive," a court looks to

"whether the proffered evidence, looked at as a whole, may suffice to raise the

inference." <u>LeBoon</u>, 503 F.3d at 232. "Among the kinds of evidence that a plaintiff can

proffer are intervening antagonism or retaliatory animus, inconsistencies in the

employer's articulated reasons for terminating the employee, or any other evidence in the

record sufficient to support the inference of retaliatory animus." <u>Id.</u> at 232-33. "The

mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the

plaintiff." <u>Id.</u> at 233.

More recently, the Third Circuit held that "a temporal proximity greater than ten

days requires supplementary evidence of retaliatory motive." <u>Blakney v. City of Phila.</u>,

559 F.App'x 183, 186 (3d Cir. 2014). Temporal proximity is measured from the date on

which the plaintiff first engages in protected activity. <u>Id.</u> (citing <u>Jalil v. Avdel Corp.</u>, 873

F.2d 701 (3d. Cir. 1989)). However, a plaintiff can also show causation by showing

"circumstantial evidence of a pattern of antagonism following the protected conduct . . ."

<u>Kachmar v. Sungard Data Sys., Inc.</u>, 109 F.3d 173, 177 (3d Cir. 1997).

Here, Newell fails to demonstrate either temporal proximity or a pattern of

ongoing antagonism from the time she first seriously complained about discrimination to the date of her termination.  Newell first voiced concerns about the defendants' conduct in January 2012 with respect to Couple A.  That confrontation occurred five months before her termination on May 18, 2012, and therefore does not fall within a sufficiently suspicious time period to satisfy Newell's burden.  Similarly, Newell's ongoing discussion regarding the CIP, WWT, and Guidelines, began on February 22, 2012, when Newell first provided feedback on the CIP.  The four month period between that date and her termination is also insufficient to carry Newell's burden.

Because Newell is unable to rely on temporal proximity to establish a causal link between her protected activity and her termination, she bears the burden of demonstrating through other evidence that the defendants were motivated by a discriminatory animus or engaged in a pattern of antagonism following her protected conduct.  Kachmar, 109 F.3d at 177.  Newell is unable to do so, however, because the evidence demonstrates that the defendants were not motivated to terminate Newell's employment because of her discussion of the Act.  Instead, the evidence demonstrates that the defendants terminated Newell because she violated their conflict of interest policy; she made negative comments about the defendants that were disseminated to the entire Lehigh Valley senior living industry; and she had a poor attitude, was dysfunctional, and consistently showed a long-standing and intense lack of respect for her supervisor.  Further, the record contains no evidence of the defendants' ongoing antagonism or animosity against Newell following her engaging in the protected activity. Instead, Newell indicated that when she provided the FHCSP's contact information to

Nowakowski, Nowakowski was receptive to that information.

Newell's protected activity was also not followed by a pattern of discipline.  See
Kachmar, 109 F.3d at 177.  Throughout Newell's employment, the defendants made
several attempts to correct what management viewed as Newell's dysfunctional
behavior.  The evidence demonstrates that the defendants' position regarding Newell's
performance and attitude began to change around April 2011.  In April 2011,
Nowakowski and Murphy shared concerns about Newell's attitude and lack of respect to
other employees but particularly to Murphy, her direct supervisor.  By then, Newell
believed that Murphy did not trust her, and had already learned that Murphy had denied
her first request to join the Board of the Lehigh Valley Aging in Place organization.
Nowakowski also recognized the tense working relationship between Newell and
Murphy due to "trust issues" between them.

On February 28, 2012, Murphy circulated a list of talking points that she
discussed with Newell on February 29, 2012.  Later, on March 26, 2012, Murphy
emailed Lovitz, stating that she intended to meet with Newell again, and that she
intended to discuss Newell's perceived unhappiness at Traditions, and the need for
Newell to change her attitude or she would have to consider leaving Traditions.  On
March 27, 2012, Lovitz commented that Newell was "supporting dysfunction within the
team."  See Document #71-33, Exhibit DD.  That same date, Murphy and Nowakowski
met with Newell to discuss the problems that Newell was having.  Murphy further
testified that the meeting was held because Newell "was just being insubordinate and

having just behavior issues." <u>See</u> Document #71-7, Exhibit D at 17.  Newell contacted

the FHCSP later that very day and spoke with Ms. Bolin for the first time after her

superiors spoke with Newell.  More than two months after Newell claimed the

defendants discriminated against Couple A, and more than one month after the revised

version of guidelines had been forwarded to her, Newell contacted the FHCSP on the

very day that she had been reprimanded about completely unrelated behavior.  Emails

between Lovitz, Nowakowski, and Murphy on May 8 and 9, 2012 demonstrate that they

universally agreed that Newell's statement was unacceptable and painted the defendants

in a negative light, causing Lovitz to comment that this latest incident was a "perfect

example of the problem." <u>Id.</u>

On May 18, 2012, ten days after Newell published the negative comments to the

LVAIP, Lovitz terminated Newell's employment because Newell violated the conflict of

interest policy with regard to Couple B, failed to present the defendants in a positive

light, and because he was fed up with her dysfunctional attitude in the marketing

department.  After providing Newell with ample notice of their concerns and with an

opportunity to change her behavior, the defendants determined that it was necessary to

terminate Newell's employment.

Ultimately, Newell fails to demonstrate a causal connection between her raising

concerns about the defendants' compliance with the Act and her termination.  The

defendants' management had been dealing with Newell's poor attitude since April 2011.

On the day she was again reprimanded for her dysfunctional behavior, Newell contacted

the FHCSP.  Management was not focused on Newell's complaints about possible

violations of the Act.  Instead, Murphy was unfazed by Newell's refusal to document

"loss leads," attributing the refusal as typical pushback from a problem employee.

Further, Nowakowski was receptive when Newell forwarded her the FHCSP's contact

information.

Accordingly, there being no evidence of causal connection, I find that Newell has

failed to satisfy the third prong for a *prima facie* case for retaliation under Section 3617.

In the alternative, even if Newell were able to establish a *prima facie* case for

retaliation, this action would still fail because the defendants articulated legitimate non-

discriminatory reasons for their decision to terminate Newell's employment, and Newell

has failed to demonstrate that those reasons were pretext.  The evidence is strong that the

defendants terminated Newell's employment based on several issues involving her

performance, poor attitude, and a violation of the defendants' conflict of interest policy.

Because the defendants have set forth these reasons for the adverse action, the burden

shifts back to Newell to submit evidence from which a fact finder could reasonably: "(1)

disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  The pretext

analysis is often "factually inseparable" from the causation element of the *prima facie*

case.  Zaffuto v. Walmart Stores, 130 F.App'x 566, 569 (3d Cir. 2005).  Evidence

relevant to pretext may include evidence that "demonstrate[s] such weaknesses,

implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-[retaliatory] reasons." <u>Fuentes</u>, 32 F.3d at 765.

Newell has failed to put forth any evidence for a factfinder to reasonably determine that the defendants' proffered reasons for the adverse action against her are pretext and that retaliation was more likely than not a factor in the adverse action. Accordingly, the defendants' motion for summary judgment is granted, and the plaintiff's motion for partial summary judgment is denied.

An appropriate Order follows.